UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| LEONARD W. NASH, an individual,<br><br>         Plaintiff,<br><br>    vs.<br><br>QUALTRICS INTERNATIONAL INC., a Delaware corporation formerly known as CLARABRIDGE, INC., BAS BRUKX, an individual, KARL KNOLL, an individual, and MARK BISHOF, an individual,<br><br>         Defendants. | Case No.<br><br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT FOR DAMAGES AND OTHER RELIEF BECAUSE OF DEFENDANTS' SECURITIES AND EXCHANGE ACT VIOLATIONS**

Plaintiff Leonard W. Nash ("Plaintiff" or "Nash"), by and through his undersigned attorneys, as and for his Complaint against defendants Qualtrics International Inc. ("Qualtrics" or the "Corporation") formerly known as Clarabridge, Inc. ("Clarabridge"), Bas Brukx ("Brukx"), Karl Knoll ("Knoll") and Mark Bishof ("Bishof" and together with Qualtrics, Brukx, and Knoll the "Defendants"), alleges on personal knowledge, except where indicated that such allegations are on information and belief, as follows:

## I.   NATURE OF THE ACTION

1.     This is an action for securities fraud. Plaintiff is a former senior executive of Clarabridge, a private company, and was a "key holder" of its preferred stock since 2014. As a "key holder," Plaintiff had certain rights and a relationship of trust with the individual defendants. In November and December 2020, Plaintiff asked Brukx and Knoll whether Clarabridge was involved in a "sales process" with a potential acquirer. Both Brukx and Knoll affirmatively stated that there "was no active sales process" and "no bankers" had been retained. Clarabridge then offered to purchase all of Plaintiff's preferred stock at a reduced price of $6.30 per share.

2.     Based on the representation by Brukx and Knoll that there was no "sales process," Plaintiff accepted the offer by Clarabridge to purchase his shares. Just before the closing of the transaction, Knoll confirmed to Plaintiff's counsel that there was no active sales process.

3.     The statements made by Brukx and Knoll were false and misleading because at the time they were made, Clarabridge was actively involved in a process to sell the entire Corporation to Qualtrics at a price of over $22 per share. Bishof later disclosed that Defendants had been in active discussions with Qualtrics for the time period from about July 2020 through July 2021. Defendants were motivated to conceal the truth because purchasing

2

and canceling Nash's shares would proportionally increase the amounts received by the individual Defendants in the sale to Qualtrics.

4.      Plaintiff justifiably relied on the statements made by Brukx and Knoll when he agreed to sell his stock at a reduced price. As a former executive and "key holder" of Clarabridge preferred stock, Plaintiff had a long-standing relationship of trust with Brukx, Knoll, and other executives of Clarabridge, who regularly provided confidential information to Nash. Defendants were the only source of relevant information available to Nash at the time. Defendants convinced Plaintiff that the price offered by Clarabridge accurately reflected the value of the Plaintiff's shares when that was not the case.

5.      Defendants' misstatements and omissions caused Plaintiff damages. Believing that there was no active sales process, and his shares were totally illiquid, Nash sold his shares to Clarabridge at a reduced price of $6.30 per share. A little more than six months later, Defendants announced the sale to Qualtrics at $22.00 per share. Had Plaintiff known that Clarabridge was involved in an active sales process expected to close in 2021, Plaintiff would have held onto his shares until the sale to Qualtrics and would have obtained a much higher price per share.

## II.   PARTIES

6.      Nash is a United States citizen, who currently resides in United Kingdom.

7.      Upon information and belief, Qualtrics is a Delaware corporation with its principal place of business in Provo, Utah.

8.      Qualtrics is successor-in-interest to Clarabridge pursuant to a merger and acquisition that closed in October 2021 by which Qualtrics acquired 100% of the stock of Clarabridge.

9.      Upon information and belief, Brukx is an individual residing in Fairfax County, Virginia. Brukx was the Chief Financial Officer ("CFO") of Clarabridge during the relevant time. Brukx was closely involved in the acquisition of Clarabridge by Qualtrics.

10.     Upon information and belief, Bishof is an individual residing in Great Falls, Virginia. Bishof was the CEO of Clarabridge during the relevant time. Bishof was closely involved in the acquisition of Clarabridge by Qualtrics. He now serves as a Strategic Advisor at Qualtrics.

11.     Upon information and belief, Knoll is an individual residing in Salt Lake City, Utah. Knoll was the General Counsel of Clarabridge during the relevant time. Knoll was closely involved in the acquisition of Clarabridge by Qualtrics. He is now a legal consultant at Qualtrics.

12.     Upon information and belief, non-party Sanju Bansal ("Bansal") was a long-serving member of the Board of Directors of Clarabridge. Bansal was closely involved in the acquisition of Clarabridge by Qualtrics.

### III.   JURISDICTION AND VENUE

13.     Qualtrics is a corporation organized under the laws of the State of Delaware.

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the common law claims asserted in this action.

15.     Venue is proper in this district in accordance with 28 U.S.C.§ 1391(b)(2) because the Corporation, including its predecessor, is incorporated in this district and a substantial part of the events or omissions by the individual defendants that gave rise to the claims occurred while those individuals were acting as agents of the Corporation or its predecessor.

### IV.   SUBSTANTIVE ALLEGATIONS

16.     During the relevant time and just prior to the transaction at issue, Nash owned 357,392 shares of Series A-1 Preferred Stock (the "Preferred Stock") of Clarabridge which he had been holding since 2014.

17.    Because he owned Preferred Stock, Nash was deemed a "key holder" of Clarabridge stock entitled to certain benefits and subject to certain obligations under relevant corporate documents.

18.    Among other things, "key holders" like Nash are obligated to give and receive prior notice of, and entitled to certain rights to participate in, potential sales of stock of Clarabridge by other "key holders."

19.    In his capacity as a "key holder" of Clarabridge stock, Nash also has regularly received from management periodic confidential reports regarding the state of its business, financial performance, and prospects going forward.

20.    In early November 2020, Nash conducted an analysis of his personal securities portfolio in connection with retirement planning.

21.    In evaluating his holdings of Clarabridge, Nash reviewed the confidential financial reports and management reports that Clarabridge management had provided earlier in 2020. He also took steps to obtain updated financial information from the company.

22.    On November 10, 2020, Nash wrote to Brukx to request a telephone call to discuss the current financial performance of Clarabridge and its upcoming prospects.

23.     Brukx agreed to speak with Nash on November 13, 2020 because of his status as a "key holder" of Clarabridge stock.

24.     During the call, Brukx discussed the confidential management and financial reports previously provided to Nash a few months earlier. Brukx also expressed his understanding of Clarabridge's current circumstances and near-term prospects, and Brukx's view that the value of Clarabridge was in the range of $300 million to $350 million. Brukx failed to disclose that Clarabridge had commenced active sales discussions with Qualtrics.

25.     Based on the information provided by Brukx, Nash concluded that his holdings might be valued higher if there was active interest in Clarabridge stock and asked Brukx if there was a pending "sales process" with any potential acquirers or if Clarabridge had retained bankers to sell the company.

26.     Brukx stated that there was no pending "sales process" and "no bankers."

27.     Nash then asked if Brukx knew of anyone who might be interested in acquiring his Preferred Stock.

28.     On information and belief, Brukx communicated separately to Bishof regarding Nash's inquiry and was directed to refer Nash to Bansal.

29.     A few days after the November 13, 2020 call, Brukx referred Nash to Bansal, a long-time member of the Board of Directors.

30.     Nash then had several conversations with Bansal regarding the state of the Corporation and its likely prospects.

31.     During these conversations, Bansal expressed his views concerning the current "risks" faced by the Corporation but did *not* disclose that Clarabridge was actively involved in a sales process.

32.     On November 16, 2020, Nash offered to sell his Preferred Stock to Bansal for approximately $7.50 per share (implying a corporate valuation of $390 million).

33.     Nash arrived at this valuation based on the guidance by Brukx that there was no active sales process for Clarabridge's shares.

34.     On November 19, 2020, Bansal countered with a proposal to purchase Nash's shares at $6.30 per share (implying a corporate value of $327.6 million). Bansal did *not* disclose that there was an active process to sell Clarabridge.

35.     Based on the statement made by Brukx, that there was no active sales process for Clarabridge, Nash considered Bansal's proposed reduced purchase price of $6.30 to reflect a reasonable discount for the illiquidity of Clarabridge stock.

A.    **Defendants Made False and Misleading Statements and Omissions.**

36.    The statements by Brukx during the November 13, 2020 call, that there was no active sales process, was false and misleading because Clarabridge was actively involved in a sales process with Qualtrics.

37.    Brukx misled Nash by stating that there was not an active sale process and omitted to disclose the discussions with Qualtrics.

38.    Without knowledge of the discussions between Clarabridge and Qualtrics, and without access to information regarding those discussions independent of the Defendants, Nash gave notice to all other "key holders" of Clarabridge stock regarding his contemplated sale of the Preferred Stock to Bansal at a reduced price of $6.30 per share on or about December 15, 2020. This notice was required pursuant to the Fifth Amended and Restated Right of First Refusal and Co-sale Agreement (the "ROFR Agreement").

39.    On December 17, 2020, Knoll called Nash's attorney, Michael Schwamm ("Schwamm"). Knoll stated that he was giving "unofficial" notice that Clarabridge was going to exercise its right of first refusal (the "ROFR") to purchase Nash's Preferred Stock on the same terms as offered by Bansal.

40.    During the December 17, 2020 call, Schwamm asked if Clarabridge was engaged in sale discussions in the last six months. Knoll confirmed that Clarabridge was not actively involved in discussions to sell the

company. After the call, Schwamm accurately relayed Knoll's statements to Nash.

41.     On or about December 24, 2020, Brukx sent Nash a formal notice of Clarabridge's intent to exercise its ROFR to purchase the Preferred Stock on the same terms as offered by Bansal.

42.     On the same day, Nash's attorney, Schwamm, had a call with Knoll and Brukx regarding the ROFR.

43.     During the call, Schwamm (in his role as Nash's counsel) again asked Knoll if Clarabridge was "running a sale process" or "holding an LOA" (referring to a letter or memorandum agreement of agreement between Clarabridge and a potential acquiror regarding a potential sale of the business).

44.     During the call, Knoll stated that that Clarabridge was "not in an active process, nor are we holding an LOA." After the call, Schwamm accurately relayed Knoll's statements to Nash.

45.     After his call with Schwamm, Knoll sent a draft Stock Repurchase Agreement. The draft stock purchase agreement contained a "big boy" provision, which provided, in part, that "The Holder hereby acknowledges that Holder has not relied on any representation or statement of the Company in making Holder's investment decision to sell the Shares and acknowledges that the Company has no duty or obligation to provide such

Holder any such information" and "the Holder waives and releases any claims that it might have against the Company whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Non-Public Information in connection with the sale of the Shares and the transactions contemplated by this Agreement. . . ."

46.     On December 28, 2020, Schwamm sent back a version of the Stock Repurchase Agreement with a revision providing for a representation by Clarabridge that "The Company is not actively engaged in negotiations with respect to the sale of all or a significant amount of the securities or assets of the Company (a "Sale of the Company") nor has it received within the prior six months or reasonably expects to receive within the next six months an indication of interest,  letter of intent, or similar document with respect to a Sale of the Company."

47.     In his December 28, 2020 email to Knoll, Schwamm stated "Karl: Thank you for the draft.  Attached is a revised version reflecting our changes – which are mostly to conform the company and seller representations, where appropriate. I have also added a company rep that there are no active discussions ongoing with respect to a sale (**as we had discussed**)" (emphasis added).

48.    Later that day, Knoll wrote by email to Schwamm: "Michael, thanks, but to be clear, **I told you that I could tell you that**, but that we wouldn't provide a company rep to that effect in the document. We wouldn't include something that undermines in any way the big boy reps that our board is requiring" (emphasis added).

49.    Having received oral confirmation from Brux (on November 13, 2020) and Knoll (on December 17 and December 24, 2020) that there was no active sales process for the company and relying on that confirmation, Nash agreed to sell his Preferred Stock back to Clarabridge at a reduced price of $6.30 per share (implying a corporate value of approximately $327.6 million).

50.    Bishof, who was also a "key holder" of Clarabridge stock, and who had received Nash's December 15, 2020 notice, omitted to disclose during this period that they were involved in a sales process to sell Clarabridge.

51.    On January 4, 2021, the sale of Nash's Preferred Stock to Clarabridge closed at a price of $6.30 per share.

52.    About six months later, on or about July 29, 2021, Qualtrics announced that it had entered into a definitive agreement to purchase Clarabridge for $1.125 billion (implying a price of $22 per share).

53.     About two weeks after the deal was announced, during the second week of August 2021, Bishof held an all-hands Zoom meeting for stakeholders of Clarabridge.

54.     During the meeting, Bishof stated that he, Sid Banerjee (a member of Clarabridge's Board of Directors), and others "had been talking probably **for over a year now in earnest**" regarding the sale to Qualtrics. (emphasis added).

55.     Bishof's statement at the August 2021 all-hands meeting is an admission that Clarabridge was actively involved in a sales process with Qualtrics beginning no later than July 2020.

56.     Both Brukx's statement to Nash on November 13, 2020 and Knoll's statements to Schwamm, Plaintiff's attorney, on December 17 and December 24, 2020, each confirming that there was no sales process, were false and misleading. Plaintiff justifiably relied on these false and misleading statements to his detriment.

### B.     Defendants' Misstatements and Omissions Were Material.

57.     The statements by Brukx and Knoll, that there was no active sales process, was material because the existence of active interest in Clarabridge's shares would have increased the value of Nash's Preferred Stock during the relevant period.

13

58.     The statements by Brukx and Knoll were also material because these statements induced Nash to agree to accept the company's ROFR at the reduced price of $6.30 per share, a price which reflected the false perception of illiquidity for the stock.

59.     Brukx's and Knoll's omissions of the fact that Clarabridge had been involved in a sales process in 2020 were material because active interest in the company's shares would have positively affected the price of Nash's Preferred Stock and negatively influenced Nash's decision to sell his Preferred Stock back to the Corporation at a reduced price of $6.30 per share in January 2021.

60.     Upon information and belief, the misstatements were also material because Brukx and Knoll had access to valuations that likely pegged the price of Clarabridge's stock at a value higher than $6.30 per share. The basis of this belief is that the stock was sold to Qualtrics at the price of $22 per share not long after the purchase of Nash's stock.

**C.     Defendants Acted With Scienter.**

61.     Brukx had actual knowledge of the falsity of his statement and omission of material facts during the November 13, 2020 call because in his capacity as CFO, Brukx was actively involved in the sales process with

Qualtrics, including the provision of sensitive financial information and reports to Qualtrics and its M&A advisors.

62.   Knoll had knowledge of the falsity of his statements and omissions during the December 24, 2020 call because in his capacity as general counsel, Knoll was actively involved in the sales process with Qualtrics, including the provision of sensitive legal information to Qualtrics and its M&A advisors.

63.   On information and belief, Bishof knew or should have known of the falsity of the statements made by Brukx and Knoll. Brukx and Knoll were direct reports to Bishof. Brukx and Knoll reported Nash's inquiries to Bishof. Bishof instructed Brukx to refer Nash to Bansal and discussed with Brukx and Knoll the decision to exercise Clarabridge's ROFR. Bishof was also a "key holder" of Clarabridge stock and received a copy of Nash's notice in connection with the ROFR.

64.   The corporate defendant had actual knowledge of the falsity of both Brukx's and Knoll's false statements because the knowledge of Brukx, Knoll, Bishof, and the board of directors is imputed to the corporation. As Bishof acknowledged during the August 2021 Zoom call, he and members of the board of directors were "earnest[ly]" involved in a sales process with Qualtrics for over a year before the deal was announced on July 29, 2021.

65.     When Brukx made the false statement during the November 13, 2020 call, he was acting within the scope of his authority as the CFO of Clarabridge. On information and belief, Brukx was authorized by Bishof and/or other members of the board of directors to make the statement. The basis of this belief is the fact that Brukx referred Nash to Bansal after the November 13, 2020 call, suggesting that he discussed Nash's inquiry with Bishof and/or other board members before making the referral but Brukx never corrected his prior misstatement and omission.

66.     When Knoll made the false statement during the December 24, 2020 call, he was acting within the scope of his authority as the general counsel of Clarabridge. On information and belief, Knoll was authorized by Bishof and/or Brukx to make the false and misleading statements, during the December 17, 2020 call, that Clarabridge was "not actively engaged in sale discussions" and, during the December 24, 2020 call, that Clarabridge was "not in an active process, nor are we holding an LOA." The basis of this belief is that, as general counsel, Knoll would not have spoken with Nash's counsel on December 17 and December 24, 2020 without the knowledge and consent of Bishof, and Bishof knew that Nash had asked whether Clarabridge was involved in an active sales process and was involved in the decision to exercise the ROFR at $6.30 per share.

67.     Defendants were motivated to deceive and falsely induce Nash to sell his Preferred Stock to the Company at an artificially reduced price because doing so would result in the cancellation of Nash's shares and would proportionally increase the amounts that Bishof, Knoll, and Brukx would receive for their shares and options at the closing of the transaction with Qualtrics.

68.     Defendants' misstatements and omissions were made knowingly or recklessly and for the purpose and effect of concealing the truth about the sales process with Qualtrics and to effectuate the purchase and cancellation of Nash's shares at an artificially reduced price. Even if Defendants did not have actual knowledge of the misstatements or omissions alleged, Defendants were reckless in failing to obtain such knowledge by deliberately refraining from taking steps reasonably necessary to discover whether those statements were false or misleading.

**D.     Justifiable Reliance.**

69.     Plaintiff justifiably relied on the statements made by Defendants because Plaintiff had a long-standing business relationship and relationship of trust with Brukx and Knoll.

70.     Plaintiff's relationship with the Defendants, including Knoll, began in 2014, when Clarabridge acquired Market Metrix, a customer

experience business co-founded by Plaintiff and at which he served as CEO. As part of that transaction, Nash received the Preferred Stock of Clarabridge that is the subject of this action. Brukx and Knoll were involved in the 2014 negotiations with Nash concerning the acquisition of Market Metrix by Clarabridge.

71.     Following the 2014 acquisition, Nash became an executive of Clarabridge and worked closely with Knoll, Brukx, and other members of the senior management team at Clarabridge.

72.     As holder of the Preferred Shares, Nash was designated a "key holder" of Clarabridge stock entitled to certain benefits and subject to certain obligations, including the obligation to give and right to receive advance notice of potential sales of Clarabridge stock.

73.     As a "key holder," Nash was also entitled to and did receive periodic confidential financial and management reports concerning the operations and results of Clarabridge.

74.     The disclosure of confidential information to Nash and other "key holders" fostered a relationship of trust in the Defendants.

75.     As a result of the foregoing, Plaintiff developed close working relationships and relationships of trust with members of the Clarabridge management, including Brukx and Knoll.

18

76.    In deciding to proceed with the sale, Plaintiff relied, in particular, on the honesty and integrity of Brukx and Knoll, with whom he had worked in the past and considered to be friends.

77.    Based on the language of Knoll's December 28, 2022 email, Plaintiff reasonably believed that Knoll was telling the truth during the phone call with Schwamm, *i.e.*, that there were no sales discussions, and that Knoll had been authorized to convey that information.

78.    The "big boy" provision did not relieve Knoll and Brukx from their duty under the federal securities laws not to make material misstatements or omissions in connection with the purchase of Plaintiff's securities.

79.    Knowledge of the active sales process between Clarabridge and Qualtrics was unique to Qualtrics, Clarabridge, their respective management teams (including Brukx, Knoll, and Bishof), and their respective advisors.

80.    At the time Nash inquired about a sales process and discussed the ROFR, Defendants were the only source of relevant information available to him. The discussions between Clarabridge and Qualtrics were not public knowledge at that time.

81.    At the time of the misstatements, Clarabridge, a private company, had not publicly disclosed that it was involved in a sales process.

19

82.     At the time of the misstatements, Qualtrics, a public company, had disclosed that it intended to use a portion of proceeds from a public offering for an acquisition, but had not disclosed the identity of any acquisition target.

83.     Accordingly, Brukx, Knoll, Bishof, Bansal, and the board of directors of Clarabridge, were the only sources of information available to Nash regarding whether the corporation was involved in a sales process or if any other person had expressed an interest in purchasing Clarabridge stock.

84.     Defendants knew that Nash was relying on the information provided by Defendants in deciding whether to sell his Preferred Stock at a reduced price of $6.30 per share. Defendants also knew or should have known that they were the only sources accessible to Nash with the relevant information.

85.     Defendants could have permissibly disclosed to Nash the existence of a sales process because of Nash's status as a "key holder" of Clarabridge stock.

86.     Accordingly, Plaintiff was justified in relying on the affirmative statements by Brukx and Knoll that there was no "sales process," "no bankers," and no "LOA."

**E.    Loss Causation.**

87.    Defendants' misstatements and omissions proximately caused Nash to suffer a loss.

88.    Defendants' statement that there was no active sales process ongoing in November and December 2020 was a substantial factor in Nash's decision to sell his Preferred Stock to Clarabridge for a reduced price of $6.30 per share.

89.    Had Nash known that Clarabridge was actively involved in a sales process with Qualtrics, Nash would not have sold his shares of Preferred Stock to Clarabridge at the price of $6.30 per share. Instead, Nash would have held his Preferred Stock for sale to Qualtrics.

90.    In its Form 10-Q for the period ending September 30, 2021 ("Q3 2021"),[1] Qualtrics disclosed that it completed the acquisition of Clarabridge on October 1, 2023 for aggregate consideration of $1.125 billion in exchange for all outstanding shares of Clarabridge Stock.

91.    The consideration paid for Clarabridge implies a purchase price of $22 per share.

---

[1] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001747748/000162828021020380/xm-20210930.htm

92.    Relevant corporate documents entitled Nash to participate in any sale of Clarabridge on the same terms as other "key holders."

93.    Accordingly, had Nash sold his shares to Qualtrics as part of the sale of Clarabridge, he would have received consideration greater than $6.30 per share.

## V.    FIRST CAUSE OF ACTION

**Violation of the Securities and
Exchange Act of 1934 § 10(b) and Rule 10b-5
Promulgated Thereunder**
(Against Qualtrics, Brukx, and Knoll)

94.    Plaintiff re-alleges each of the foregoing paragraphs, as if fully set forth herein.

95.    As specifically detailed herein, Qualtrics, Brukx, and Knoll: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Plaintiff in connection with the sale of his Series A-1 Preferred Stock in an effort to benefit Defendants, individually or collectively, at the expense of Plaintiff, in violation of §10(b) of the Exchange Act and Rule 10b-5.

96.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the

mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the active sales process between Clarabridge and Qualtrics.

97.    As set forth more particularly herein, Defendants had actual knowledge of the misstatement and omission of material facts set forth herein. Defendants' material misstatement and omission was done knowingly or recklessly and for the purpose and effect of concealing the truth about the foregoing from Plaintiff. Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

98.    As a result of the dissemination of the materially false and/or misleading statement and/or failure to disclose material facts, as set forth above, Defendants induced Plaintiff to enter into the Stock Repurchase Agreement and to sell his Preferred Stock at a price substantially lower than the price Plaintiff would have received if he had held his Preferred Stock until the closing of the merger and acquisition between Clarabridge and Qualtrics.

99.    At the time of Defendants' misstatements and omissions, Plaintiff was ignorant of the falsity of the misstatement and reasonably believed it to be true.

100.   Plaintiff relied on Defendants to disclose all material facts truthfully.

101.   Had Plaintiff known the truth regarding the foregoing, which was not disclosed by Defendants, Plaintiff would not have sold his shares of Preferred Stock to Clearbridge or, if he had sold his stock, he would not have done so at the artificially deflated price of $6.30 per share.

102.   By virtue of the foregoing, Plaintiff has suffered a calculable loss.

103.   As a direct and proximate result of Defendants' wrongful conduct, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in connection with the purchase and sale of Plaintiff's Series A-1 Preferred Stock.

## VI.   SECOND CAUSE OF ACTION

### Violation of the Exchange Act § 20
(Against Brukx, Knoll, and Bishof)

104.   Plaintiff re-alleges each of the foregoing paragraphs, as if fully set forth herein.

105.   By virtue of their high level positions, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements disseminated to Plaintiff, defendants Brukx, Knoll, and Bishof (together, the "Control Group") had the power to influence and control,

24

and did influence and control, directly or indirectly, the decision making of the Company, including the dissemination to Plaintiff of various statements which Plaintiff contends were false and misleading, the exercise of Clarabridge's ROFR concerning the purchase and sale of Plaintiff's shares at a price of $6.30 per share, and the concealment from Plaintiff of the active sales process between Clarabridge and Qualtrics. The Control Group was provided with or had unlimited access to information concerning the active sale process between Clarabridge and Qualtrics before Plaintiff, including the contemplated acquisition price and other information, and had the ability to prevent the issuance of the false and misleading statements or cause the statements to be corrected.

106.   In particular, each member of the Control Group had direct and supervisory involvement in the efforts of the Company to sell Clarabridge to Qualtrics and the power to control or influence the exercise of ROFR with respect to Plaintiff's Preferred Stock.

107.   As set forth above, each member of the Control Group violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the members of the Control Group are liable pursuant to §20(a) of the Exchange Act.

108.   As a direct and proximate result of the individual Defendants' wrongful conduct, Plaintiff suffered damages in connection with the purchase and sale of his Series A-1 Preferred Stock.

## VII.   RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests judgment against Defendants and for such other relief as follows:

a.  On the First Cause of action, awarding Plaintiff damages in an amount to be determined at trial; and

b.  On the Second Cause of Action, awarding Plaintiff damages in an amount to be determined at trial; and

c.  For an accounting of all monies, property, and all other benefits obtained by Defendants resulting from the conduct alleged herein; and

d.  Disgorgement of Defendants' ill-gotten gains resulting from the conduct alleged herein; and

e.  Imposition of a constructive trust over Defendants' ill-gotten gains derived from the conduct alleged herein; and

f.  Awarding Plaintiff prejudgment interest at the maximum rate permissible under law; and

g.  Awarding Plaintiff his attorneys' fees (pursuant to § 6.9 of the ROFR); and

h.  Awarding Plaintiff costs, disbursements, and expenses in an amount to be determined at trial, plus interest; and

i.  Such other and further relief as this Court deems just and proper.

## VIII.  JURY DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: May 31, 2023

Respectfully submitted,

*/s/ Thomas A. Uebler*
Thomas A. Uebler (#5074)
MCCOLLOM D'EMILIO SMITH UEBLER LLC
2751 Centerville Rd. Suite. 401
Wilmington, DE 19808
(302) 468-5963
tuebler@mdsulaw.com

Of Counsel:

Michael Pérez*
PEREZ VAUGHN & FEASBY INC.
600 B Street, Suite 2100
San Diego, CA 92101
Tel. (619) 784-3550
perez@pvflaw.com

Michael James Maloney*
Rosanne E. Felicello*
FELICELLO LAW P.C.
366 Madison Ave, 3rd FL
New York, New York 10017
Tel. (212) 584-7806
mmaloney@felicellolaw.com
rosanne@felicellolaw.com

*Attorneys for Plaintiff Leonard W. Nash*
*\*pro hac vice forthcoming*